UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

SILVIA MONICA AYALA-SALAMAT,

        Plaintiff,

   v.

NANCY A. BERRYHILL,

        Defendant.

Case No. 16-CV-04838-LHK

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 18, 21

Plaintiff Silvia Monica Ayala-Salamat ("Plaintiff") appeals a final decision of the Commissioner of Social Security ("Defendant") denying Plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act. Before the Court are Plaintiff's motion for summary judgment, ("Pl. MSJ") ECF No. 18, and Defendant's cross-motion for summary judgment, ("Def. MSJ") ECF No. 21. Having considered the parties' briefs and the record in the case, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross-motion for summary judgment.

## I.    BACKGROUND

### A.  Factual Background

Plaintiff was born on September 9, 1964. Administrative Record ("AR") at 53. Plaintiff is a high school graduate. *Id.* Plaintiff worked as an operations manager for a commercial real estate company from March 2001 until May 2011. AR 224. On May 2, 2011, at age 46, Plaintiff was struck in the head by a 6-foot fence pole while at work. AR 833. In her application for disability benefits, Plaintiff alleged that she became disabled on May 2, 2011 due to the following: memory problems, dizziness and blurred vision, depression, severe chronic fatigue, speech problems, inability to handle her own mail and money, intermittent nausea, inability to focus on tasks, medication side effects, and brain injury. AR at 93–94. Plaintiff has acquired sufficient quarters of coverage to remain insured through June 30, 2017. AR at 19. Additional facts are discussed as necessary in the analysis.

**B. Procedural History**

On March 31, 2013, Plaintiff applied for a period of disability and disability insurance benefits and alleged that she had become disabled on May 2, 2011. AR 191. Plaintiff's application was denied initially and upon reconsideration. AR 136–40, 142–48. An Administrative Law Judge ("ALJ") conducted a hearing on December 17, 2014. AR 48–92. At the hearing, Plaintiff appeared with a non-attorney representative and testified about her physical and mental health as they relate to her ability to work. AR 48–92. Vocational Expert ("VE") Joy Yoshioka and Psychological Expert ("PE") Alfred Jonas also appeared and testified at the hearing. *Id.*

On April 15, 2015, the ALJ issued a written decision denying Plaintiff's request for Social Security disability insurance benefits. AR 16–47. In making her decision, the ALJ stated that she considered the entire record. AR 24. The ALJ applied the five-step evaluation process for determining disability described in 20 C.F.R. § 404.1520(a). After applying the five-step evaluation process, the ALJ concluded that Plaintiff was not disabled and denied her request for SSDI. AR 42.

Plaintiff appealed the ALJ's decision to the Social Security Administration's Appeals Council. AR 14–15. The Appeals Council denied Plaintiff's request for review. AR 1–6. Thus, the

Case No. 16-CV-04838-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

1    ALJ's decision became the final decision of the Commissioner on July 22, 2016. AR 5.

2         On August 23, 2016, Plaintiff filed her complaint in this Court. ECF No. 1. On January 26,

3    2017, Plaintiff filed her motion for summary judgment. ECF No. 18. On March 23, 2017,

4    Defendant filed its cross motion for summary judgment and opposition to Plaintiff's motion for

5    summary judgment. ECF No. 21. On April 19, 2017, Plaintiff filed her reply. ECF No. 22.

6    **II.    LEGAL STANDARD**

7        **A.  Standard of Review**

8         This Court has the authority to review the Commissioner's decision to deny benefits.  42

9    U.S.C. § 405(g).  The Court will disturb the Commissioner's decision "only if it is not supported

10   by substantial evidence or is based on legal error."  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169

11   F.3d 595, 599 (9th Cir. 1999).  In this context, "substantial evidence" means "more than a mere

12   scintilla but less than a preponderance—it is such relevant evidence that a reasonable mind might

13   accept as adequate to support the conclusion." *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir.

14   1995) (per curiam); *see also Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).  When

15   determining whether substantial evidence exists to support the Commissioner's decision, the Court

16   examines the administrative record as a whole, considering adverse as well as supporting

17   evidence.  *Drouin*, 966 F.2d at 1257; *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).

18   Where evidence exists to support more than one rational interpretation, the Court must defer to the

19   decision of the Commissioner.  *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

20       **B.  Standard for Determining Disability**

21        The Social Security Act defines disability as the "inability to engage in any substantial

22   gainful activity by reason of any medically determinable physical or mental impairment which can

23   be expected to result in death or which has lasted or can be expected to last for a continuous period

24   of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must also be so severe

25   that a claimant is unable to do her previous work and cannot "engage in any other kind of

26   substantial gainful work which exists in the national economy," given her age, education and work

27

28

Case No. 16-CV-04838-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

experience. 42 U.S.C. § 423(d)(2)(A).

"ALJs are to apply a five-step sequential review process in determining whether a claimant qualifies as disabled." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). At step one, the ALJ determines whether the claimant is performing "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. If not, the analysis proceeds to step two. At step two, the ALJ determines whether the claimant suffers from a severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If not, the claimant is not disabled. If so, the analysis proceeds to step three. At step three, the ALJ determines whether the claimant's impairment or combination of impairments meets or equals an impairment contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled. If not, the analysis proceeds to step four. At step four, the ALJ determines whether the claimant has the residual functioning capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If so, the claimant is not disabled. If not, the analysis proceeds to step five. At step five, the ALJ determines whether the claimant can perform other jobs in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled. If not, the claimant is disabled.

"The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray*, 554 F.3d at 1222. "The Commissioner can meet this burden through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2." *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).

## III. DISCUSSION

Plaintiff does not contest the ALJ's decision in steps one, two, and three. At step four, Plaintiff claims that the ALJ gave inadequate reasons for discounting or partly discounting certain opinions in the record. At step five, Plaintiff claims that the ALJ improperly relied solely on the grids rather than relying on the testimony of a Vocational Expert.

The Court first summarizes the relevant medical evidence and then addresses Plaintiff's

4

arguments in turn.

### A. Relevant Medical Evidence

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." *Id.*

Accordingly, when evaluating medical evidence, an ALJ must give a treating physician's opinion "substantial weight." *Bray*, 554 F.3d at 1228. "When evidence in the record contradicts the opinion of a treating physician, the ALJ must present 'specific and legitimate reasons' for discounting the treating physician's opinion, supported by substantial evidence." *Id.* (quoting *Lester*, 81 F.3d at 830). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors, are correct." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "However, 'the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory and inadequately supported by clinical findings.'" *Id.* (quoting *Thomas*, 278 F.3d at 957).

The record evidence regarding Plaintiff's condition is summarized below:

### 1. Treatment from May 2011 to September 2012

Soon after her May 2, 2011 accident, Plaintiff was diagnosed with a minor head injury, a concussion, and a single contusion of the scalp and was prescribed Antivert. Ex. 10F. However a CT scan was negative for relevant abnormalities. A consultation with a specialist showed some head tenderness and a diagnosis of post-concussive syndrome and cervical strain. Ex. 1F at 377. The specialist did not indicate whether the cervical strain was caused by the May 2, 2011 accident. The specialist approved Plaintiff to return to work as of May 10, 2011 with limitations that

Plaintiff should not perform safety sensitive work and should be allowed a break every two hours. *Id.* In follow-up appointments in the next month, Plaintiff demonstrated some tingling and spasms but relatively little pain or neck soreness, as well as the ability to ambulate with less loss of balance and the ability to tolerate outings for 3-4 hours. Ex. 2F at 385–86, Ex. 3F at 394.

Plaintiff then saw Wei Wang, M.D. between May 2011 and October 2011. Plaintiff complained of neck pain, headaches, dizziness, nausea, fatigue, photosensitivity, insomnia, and memory and concentration problems following her May 2, 2011 injury. Ex. 7F at 609. Dr. Wang stated that Plaintiff had "headaches secondary to cervicogenic causes and/or sequela of postconcussive syndrome"; "neck pain with sporadic left upper extremity parasthesias concerning for cervical radiculopathy/radiculitis'" "word finding difficulty, memory deficits, dizziness, anhedonia, intermittent nausea/vomiting, fatigue, mood disturbance, and sleep disturbance concerning for postconcussive syndrome from closed-head mild to moderate traumatic brain injury"; "vitreous humor collapse of the right eye"; and "possible depression." *Id.* at 611. Dr. Wang prescribed Nortrptyline, Treximet, and Toopmax for headaches. *Id.* at 622, 709. Dr. Wang also noted on several occasions that, "There is no impairment of insight or judgment. Memory intact. Patient has normal mood and affect." Ex. 7F at 689, 705, 709, 712. Plaintiff also underwent physical therapy between May 2011 and September 2011, during which she experienced some improvement. Exs. 2F, 3F.

On Mar 23, 2011, Dr. Wang stated that Plaintiff could return to work the next day performing sedentary work for four hours per day. Ex. 7F at 643–44. On July 19, 2011, Dr. Wang stated that Plaintiff could return to work for five hours, and later perhaps six, "if she is able to tolerate the work load and hours." *Id.* at 674. On August 8, 2011, Dr. Wang recommended Plaintiff decrease her working hours to four hours per day. *Id.* at 679. On September 12, 2011, Dr. Wang stated that Plaintiff would likely be unable to return to work for approximately two months. *Id.* at 649. However, in response to the question "[i]s employee able to perform work of any kind," Dr. Wang indicated "Yes." *Id.*

Between October 2011 and August 2012, Plaintiff was treated at Alliance Occupational Medicine. Plaintiff was treated with medications, as well as acupuncture and physical therapy, and was also given work restrictions. Ex. 4F, 5F, 6F. For example, in October 2011, Plaintiff was diagnosed with a contusion of the head, sprain/strain of the cervical spine, and sprain/strain of the upper back. Ex. 4F. The doctor also noted that Plaintiff was alert and oriented, that her speech and affect were within normal limits, and that Plaintiff's gait was normal. *Id.* at 411. The doctor recommended continuing on medication and undergoing physical rehabilitation, and the doctor noted, "No Permanent Disability Expected." *Id.* at 412.

In January 2012, Plaintiff was treated by Dr. Petros. Plaintiff exhibited some symptoms of post-concussive syndrome and continued being prescribed Treximet for headaches. Ex. 5F at 436. Dr. Petros also recommended that Plaintiff not drive at work and that Plaintiff be limited to lifting, pulling, or pushing under 25 pounds. *Id.* However, Dr. Petros concluded that Plaintiff could work six hours per day with these limitations. *Id.* at 541. Plaintiff also received 20 sessions of speech therapy before September 2012. Ex. 16F at 949.

In March 2012, Plaintiff complained of a fall due to dizziness and was referred to vestibular therapy. Ex. 6F. There is some evidence that Plaintiff attended neuromuscular and gait training in 2012, but there is no evidence that Plaintiff attended vestibular therapy after 2012. In March 2012, Plaintiff was also prescribed Nortriptyline for mood disorder and central pain symptoms, and her doctor sought authorization for additional speech language therapy, which Plaintiff received. Ex. 6F.

In July and August 2012, Plaintiff was treated for flared left-sided clinical cervical radiculitis with Medrol Dosepak, acupuncture, Vicodin, Flexeril, and an H-Wave Homecare System. Ex. 6F at 557–58, 566. Plaintiff reported an increase in overall functioning ability in August 2012. *Id.* at 543.

## 2. MRI, EEG, and EMG Evaluations

Plaintiff received an MRI on May 19, 2011, which was read as "[d]iffuse degenerative disc

United States District Court
Northern District of California

disease, with broad-based bulge @C6–7, mild to moderate facet degenerative changes without significant neural foraminal stenosis. The central canal is normal throughout." Ex. 4F at 411. Plaintiff received a second MRI of her head on May 19, 2011, which was read as "[u]nremarkable MRI appearance of brain, Empty Sella syndrome, a normal variant, and mild chronic paranasal sinusitis." *Id.* In short, the spine MRI showed cervical degenerative disease and disc bulge, but the brain MRI was normal. Ex. 16F at 948.

On March 25, 2013, Plaintiff underwent an MRI of the cervical spine that showed "some straightening of the cervical lordosis that may indicate underlying muscle spasms." Ex. 16F at 922. The findings also indicated disc disease and/or degenerative changes, which were compatible with annular tears in the C3–C4 and C6–C7 levels. *Id.* However, there were no intrinsic abnormalities in the spinal cord or the foramen magnum. There was also no large herniation or transligamentous disc extrusion, no significant lateral recess or foraminal encroachment, and no central canal narrowing. *Id.*

On May 29, 2013, Plaintiff received an electroencephalogram (EEG) which showed normal findings in wakefulness and sleep. Ex. 15F at 893. During the photic stimulation portion of the EEG, Plaintiff reported "feeling electric shocks all over [her] body . . . ." *Id.*

On May 29, 2013, Plaintiff also underwent an electromyogram (EMG) and nerve conduction study. The findings of this study were consistent with left cervical radiculitis. ECF No. 16F at 914. However, the study found that "[t]here is no electrodiagnostic evidence of peripheral entrapment neuropathy of the left median or ulnar nerve at the wrist or the elbow." *Id.*

### 3. Thynn Lynn, M.D. (Treating Neurologist)

Plaintiff saw Thynn Lynn, M.D. from September 2012 through 2014. Plaintiff consistently complained of headaches, pain, fatigue, dizziness, balance problems, occasional falls, blurry vision, sleep problems, depression, and difficulties with memory, cognition, and concentration. *See, e.g.*, Ex. 16F at 906, 908. Throughout this period, Dr. Lynn treated Plaintiff with cervical traction, occipital nerve block and trigger point injections, and medications. *Id.* Dr. Lynn also

United States District Court
Northern District of California

recommended various forms of therapy, including psychotherapy. *Id.* at 908.

In September 2012, Dr. Lynn diagnosed Plaintiff with status-post traumatic head injury with concussion and scalp contusion; post-traumatic headaches with contribution by cervicogenic headaches and occipital neuralgia pain; cervical sprain and left cervical radiculopathy; post concussive syndrome with cognitive impairment; speech difficulty and mood disorder; post-traumatic dizziness/vertigo with cognitive impairment; speech difficulty and mood disorder; post-traumatic dizziness/vertigo and possible traumatic vestibular dysfunction; visual disturbance with light hypersensitivity; floaters and pain of the eyes; and anxiety and depression secondary to head injury and chronic pain syndrome. Ex. 16F at 960. Dr. Lynn recommended speech and cognitive therapy; physical therapy; trigger point injections and/or occipital nerve block injections; medications for mental symptoms; and a formal evaluation for vestibular problems. *Id.* at 961.

In October 2012, Dr. Lynn prescribed Cymbalta for depression and anxiety, and in November 2012, Dr. Lynn administered occipital nerve block injections and trigger point injections and prescribed Motrin and Vicodin, to which Plaintiff responded well. *See, e.g.*, *id.* at 933–34. Plaintiff again underwent occipital nerve block injections and trigger point injections in February 2013 after complaining of severe headaches. *Id.* at 925. In May 2013, Plaintiff was continued on medications with an increased dose of Flexeril, and in June 2013, Dr. Lynn recommended eight psychotherapy sessions for Plaintiff. *Id.* at 912, 915.

In August 2013, Dr. Lynn treated Plaintiff with Saunder's cervical traction and advised Plaintiff to exercise at home. *Id.* at 906. In December 2013, Plaintiff appeared distressed and tearful, and Dr. Lynn again administered occipital nerve block injections and trigger point injections, after which Plaintiff reported instant relief. Ex. 29F at 1175–76. Dr. Lynn advised Plaintiff to continue home exercise and to take Motrin and Vicodin for pain. *Id.* In June 2014, Plaintiff flew to Utah for a wedding and took Xanax to help with anxiety and panic attacks associated with flying. *Id.* at 1159.

In September 2014, Plaintiff recommended chiropractic sessions, continued speech and

cognitive therapy, continued psychological counseling and psychotherapy, medication, home exercises, and using computer brain training games such as Lumosity. *Id.* at 1156–57.

During the time that Dr. Lynn was Plaintiff's treating physician, Plaintiff was also examined by Dr. Scott Feldman, an optometrist, on August 14, 2012. Ex. 13F. In a June 4, 2013 report describing the earlier examination, Dr. Feldman found that Plaintiff had 20/20 vision in both eyes. *Id.* at 871. Dr. Feldman noted no pathological findings, full visual fields in each eye, and no reason to believe that Plaintiff had any significant visual defect that "causes her problems of consequence and certainly not a disability." *Id.* Although Plaintiff had vitreous collapse, Dr. Feldman emphasized that this is "a very normal occurrence in someone her age." *Id.*

### 4. Robert Larsen, M.D.

Robert Larsen, M.D., conducted a psychiatric evaluation of Plaintiff on May 17, 2012 in Plaintiff's worker's compensation case. Ex. 19F. During the evaluation, Plaintiff was dysphoric, became teary-eyed at times, and had some problems recalling pertinent information. However, Plaintiff was also neatly attired, alert, and oriented. Additionally, Plaintiff's speech was clear and well-metered, her behavior was cooperative, and her intelligence was "grossly within normal limits." Ex. 19F at 1023–24.

As part of the evaluation, Dr. Larsen reviewed the records of Dr. Eric Morgenthaler, who administered the following psychological tests to Plaintiff: Shipley-2, the MMPI-2 personality inventory, the Symptom Checklist-90-Revised, the Beck Depression Inventory, and the Rotter Incomplete Sentences. Ex. 19F at 1025. Plaintiff scored an IQ score of 66 on the Shipley-2 test, falling within the extremely low range of adult intelligence. However, Dr. Morgenthaler stated that the Shipley-2 test likely underestimated Plaintiff's intelligence. The MMPI-2 test also suggested possible symptom exaggeration. Dr. Morgenthaler also found that Plaintiff's "differential diagnosis should include somatoform, depressive and anxiety disorders in an individual who may be exaggerating the extent of her difficulties." Ex. 19F at 1026.

Based on his review of these records, Dr. Larsen diagnosed Plaintiff with a cognitive

United States District Court
Northern District of California

disorder not otherwise specified secondary to a closed head injury. According to Dr. Larsen, Plaintiff "essentially has a post-concussion syndrome that involves persistent headache, photophobia, problems with balance, memory dysfunction and emotional lability. The applicant's short-term memory problems affect her capacity to multi-task and learn new information." *Id.* at 1029. Despite the test findings, Dr. Larsen also stated that "[t]here is no good reason to believe that [Plaintiff] is misrepresenting her true experience." *Id.* Dr. Larsen assigned Plaintiff a global assessment of functioning ("GAF") score of 50, which indicates "serious cognitive and emotional symptoms." *Id.* at 1030.

GAF scores are used by mental health professionals and are meant to subjectively assess the social, occupational, and psychological functioning of a person. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM-IV-TR 34 (2000). GAF scores range between 0 and 100. A score of 91–100 reflects "superior functioning in a wide range of activities." *Id.* A score of 81–90 reflects "good functioning in all areas." *Id.* A score of 71–80 reflects "no more than slight impairment in social, occupational, or school functioning." *Id.* A score of 61-70 reflects "some difficulty in social, occupational, or school functioning." *Id.* A score of 51–60 reflects "moderate difficulty in social, occupational, or school functioning." *Id.* A score of 41–50 reflects "serious impairment in social, occupational, or school functioning." *Id.* A score of 31–40 reflects "major impairment in several areas." A score of 21–30 reflects "inability to function in almost all areas." A score of 11–20 reflects "some danger of hurting self or others." *Id.* A score of 1–10 reflects a "persistent danger of severely hurting self or others." *Id.* Finally, a score of 0 reflects inadequate information. *Id.*

Dr. Larsen also conducted a psychiatric re-evaluation of Plaintiff on December 30, 2013. Plaintiff was dysphoric and intermittently tearful, and her speech was halting or stuttering throughout the meeting. Otherwise the results were unremarkable. Plaintiff was neatly attired, oriented, cooperative, and polite. As part of the evaluation, Dr. Larsen administered the following tests: Millon Clinical Multiaxial Inventory-III, a Symptom-Checklist-90-Revised, the Beck

11

Depression Inventory, and the Beck Anxiety Inventory. *Id.* at 1003–04. This testing showed significant elevations on anxiety disorder, somatoform disorder, major depression, dysthymic disorder, and post-traumatic stress. *Id.* at 1003. Dr. Larsen noted that the testing indicated some symptom exaggeration, but Dr. Larsen concluded that "that is probably the result of her reporting how bleak she feels about her existence and prospects for the future." *Id.* at 1007. Dr. Larsen stated that "[t]his woman is not faking." *Id.* Dr. Larsen found that his earlier GAF score of 50 "underestimate[d] . . . how symptomatic and disabled she is." *Id.* Dr. Larsen assigned a GAF score of 40, which reflects "major impairment in several areas" and concluded that Plaintiff was permanently and totally disabled. *Id.* at 1008.

### 5. Claude Munday, Ph.D.

Claude Munday, Ph.D, evaluated Plaintiff on July 12, 2012 in Plaintiff's worker's compensation case. Plaintiff reported symptoms including memory problems, mental lapses, word-finding difficulty, difficulty with household tasks, lack of energy, headaches, and depression. Ex. 22F at 1066–72. Dr. Munday administered several tests, most of which showed no obvious problems with mental flexibility or multi-tasking. *Id.* at 1072. One test, the Wechsler Adult Intelligence Scale IV test, yielded a full scale IQ of 78. *Id.* at 1073–74. On the basis of these tests, Dr. Munday diagnosed Plaintiff with post-concussion syndrome with mild cognitive residuals and assigned Plaintiff a "14% whole person impairment." *Id.* at 1078. Dr. Munday opined that Plaintiff could not return to her past work and stated that Plaintiff had the best chance of employment in a job where task demands remained static, where there was little public contact, and where Plaintiff "could work somewhat at her own pace." Ex. 23F at 1082.

### 6. Robert Perez, Ph.D.

Robert Perez, Ph.D. evaluated Plaintiff on November 26, 2012 in Plaintiff's worker's compensation case. Ex. 11F. As in other valuations, Dr. Perez discussed symptoms such as headaches, neck and left shoulder pain, vestibular difficulties, cognitive impairment, and severe depression and anxiety. *Id.* at 850–53. Plaintiff was neatly attired, participated in the interview and

questionnaires without breaks, and was "mildly labile." *Id.* at 856. Plaintiff also had a logical

thought process and her judgment and insight were unremarkable. *Id.* at 858–60. Plaintiff stood

without difficulty and walked with a normal gait. *Id.* Plaintiff had no physical difficulties or signs

of pain and sat comfortably without requesting breaks. *Id.* Plaintiff also worked on psychometric

questionnaires for two hours without a break, then after a break, Plaintiff continued to work for

another two hours. *Id.*

Dr. Perez "did not perform formal neurocognitive testing." AR 857. Instead, Dr. Perez

stated that "[d]iscussion of cognitive status is deferred to Dr. Claude Munday." *Id.* On the basis of

his own and other evaluations, Dr. Perez diagnosed Plaintiff with a cognitive disorder not

otherwise specified, adjustment disorder with significant disturbance of emotion and mood, status

post mild to moderate closed head injury, cervical spinal injury, sleep apnea, and severe stress. *Id.*

Dr. Perez also provisionally diagnosed Plaintiff with a pain disorder with physical and

psychological elements. *Id.* Dr. Perez assigned Plaintiff a GAF score of 50. *Id.*

### 7. Janine Marinos, Ph.D.

Janine Marinos, Ph.D. conducted a psychiatric consultative examination on January 16,

2014. Ex. 20F. Plaintiff reported problems with speech, writing, reading, cognition, memory,

vestibular abilities, vertigo, photosensitivity, and headaches. Plaintiff also reported decreased

depth perception, dizziness, falls, and panicky behavior. *Id.* at 1036–37. Plaintiff stated that her

mother manages Plaintiff's finances. *Id.* Plaintiff's comprehension was grossly intact, although

Plaintiff performed somewhat poorly on attention and concentration testing. *Id.* Plaintiff exhibited

linear, goal-directed thinking, fair insight and judgment, and a normal gait and posture. *Id.*

Plaintiff was administered a WAIS-IV intelligence test, a WMS-IV memory test, and a Trail

making test. *Id.* These tests showed a full-scale IQ of 79 and some impairments in memory. *Id.* at

1038–39.

Dr. Marinos diagnosed Plaintiff with depressive disorder not otherwise specified and

assigned a GAF score of 51–60, which equates to moderate symptoms or moderate difficulty in

13

United States District Court
Northern District of California

social, occupational, or school functioning. *Id.* at 1038. Dr. Marinos opined that Plaintiff would have difficulty working in a fast-paced, stressful environment. Nevertheless, Dr. Marinos found that Plaintiff would be capable of managing funds in her own best interests if she were granted benefits. *Id.* at 1039.

### 8. Maureen Miner, M.D.

Maureen Miner, M.D., evaluated Plaintiff on July 18, 2013 in Plaintiff's worker's compensation case. Ex. 27F. As in other evaluations, Plaintiff complained of headaches, blurry vision, dizziness, balance problems, face numbness, hearing hypersensitivity, stuttering, neck pain with radiation down the left arm, and fatigue. *Id.* at 1138–42. Plaintiff reported difficulty with daily life tasks such as dressing, showering, and cooking, and had word-finding difficulties and memory deficits. *Id.* Among other findings, Dr. Miner concluded that Plaintiff had some diminished sensation in her face, in and around her left ulnar nerve, and on her left arm. *Id.* at 1143–44. However, Plaintiff's sensation was intact in all four extremities. *Id.* Plaintiff exhibited 4+/5 to 5/5 strength except in her left upper extremity, in which she exhibited 4/5 strength upon wrist extension, wrist flexion, and elbow extension. *Id.* at 1144. Plaintiff had a diminished tandem gait bilaterally, but her gait was upright and symmetrical, and she did not use a cane. *Id.*

Dr. Miner diagnosed Plaintiff with "status-post object falling on patient"; traumatic brain injury with posttraumatic headache, visual disturbance, hyperacusis, dysosmia, cognitive/physical fatigue, cognitive deficits, problems with communication, mood disturbance, and disequilibrium; neck pain with cervicogenic headache contribution with left upper extremity radiation, electrodiagnostic evidence of left C7, possible left C6 radiculopathy; and obstructive sleep apnea. *Id.* at 1144–45. Dr. Miner specified that although Plaintiff had often been diagnosed with postconcussive head syndrome, a more accurate diagnosis was traumatic brain injury. *Id.* at 1145. Dr. Miner opined that "depending upon the outcome of [Plaintiff's] comprehensive treatment, . . . [Plaintiff] will likely not be competitively employable in the open labor market." *Id.*

### 9. Ronald C. Diebel, M.D. (Treating Psychiatrist)

14

Ronald C. Diebel, M.D., treated Plaintiff from late 2013 through 2014 for post-concussive disorder with depression, anxiety, and cognitive impairment. Ex. 31F. Dr. Diebel treated Plaintiff with medications and recommended cognitive behavioral therapy and cognitive linguistic re-training. Dr. Diebel prescribed Risperidone for Plaintiff and increased the dosage to 2 mg in January 2014, but then decreased the dosage in February 2014 after Plaintiff reported relative stability with the medications. *Id.* at 1185. In February 2014, Dr. Diebel also agreed that Plaintiff could benefit from a home health aide because her mother was traveling to South America. *Id.* at 1181. In August 2014, Dr. Diebel discontinued Plaintiff's use of Mirtazapine, prescribed Effexor and continued Risperidone. Ex. 31F. Plaintiff reported a better mood in September 2014. Ex. 31F.

Dr. Diebel concluded on a check-box form that Plaintiff could not meet competitive employment standards for even unskilled work. Ex. 30F at 1177. Specifically, Dr. Diebel found that Plaintiff could not meet competitive standards in making simple work-related decisions, maintaining attention for 2 hours at a time, asking simple questions or requesting assistance, taking public transportation, or maintaining socially appropriate behavior. *Id.* However, Dr. Diebel noted that Plaintiff could manage benefits in her own best interest. Ex. 30F, 31F.

**10. Alfred G. Jonas, M.D.**

Alfred G. Jonas, M.D., was the medical expert who testified at the hearing on December 17, 2014. At the hearing, Dr. Jonas summarized Plaintiff's reported symptoms and medical history, but stated that "[t]he problem in this record is that there are no objective findings really at all" to support Plaintiff's claimed limitations. AR 59. Dr. Jonas noted some possible abnormalities in MRI findings and EMG findings, but opined that these issues were minor. AR 60–61. However, Dr. Jonas also noted that the record contained evidence of symptom exaggeration. Dr. Jonas also opined that Plaintiff had no meaningful interpersonal impairments. AR 61–62. Dr. Jonas stated that he could not state definitively how Plaintiff would function over a 40-hour workweek, but Dr. Jonas opined that Plaintiff had no restrictions at all based on the objective medical evidence. AR 62–67. Dr. Jonas opined that Dr. Diebel's report was internally inconsistent because despite all the

United States District Court
Northern District of California

impairments that Dr. Diebel diagnosed, Dr. Diebel also found that Plaintiff could handle her own finances independently. AR 68–69. Overall, Dr. Jonas concluded that there were "no reliable indicators in this record of significant brain injury." AR 69.

**11. State Agency Physicans – Mental Assessments**

On September 13, 2013, the State agency psychological consultant, Dr. Aquino-Caro, considered the mental impairment Listings criteria ("paragraph B" criteria). AR 103. Dr. Aquino-Caro concluded that Plaintiff has moderate limitations in activities of daily living; mild difficulties in social functioning; moderate difficulties maintaining concentration, persistence or pace; and no episodes of decompensation of extended duration. AR 107–08.

Dr. Aquino-Caro also conducted a Mental Residual Function Capacity Assessment ("MRFC"). AR 107. From the MRFC, Dr. Aquino-Caro concluded that Plaintiff was "[a]ble to understand and remember work locations and procedures of a simple, routine nature involving 1–2 step job tasks and instructions." *Id.* Dr. Aquino-Caro also concluded that Plaintiff would "[r]espond appropriately to supervision, co-workers, and social interaction in the workplace (when social interaction is limited to small groups and is infrequent)." AR 108. Finally, Dr. Aquino-Caro concluded that Plaintiff was "[a]ble to travel, avoid workplace hazards, respond to change and set realistic goals independently." AR 109.

On February 4, 2014, another state agency consultant, Dr. Brill, considered the paragraph B criteria. AR 123. Dr. Brill concluded that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. *Id.* Like Dr. Aquino-Caro, Dr. Brill also conducted an MRFC and concluded that Plaintiff could perform up to three-step job tasks, could maintain basic concentration and attention, could function with limited social interaction in small groups, and could function in a setting "that does not place a priority on rapid task completion." AR 128–29.

**12. State Agency Physicans – Physical Assessments**

Case No. 16-CV-04838-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

On September 12, 2013, E. Wong, M.D., a state agency physician, reported a Physical Functional Capacity Assessment (PRFC). AR 102. Dr. Wong concluded that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could sit, stand, and/or walk for 6 hours in an 8-hour workday; should avoid forceful pushing or pulling with her left arm; could occasionally stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes and scaffolds; should never balance; could perform limited overhead reaching; and should avoid concentrated exposure to hazards. AR 105–06.

On February 19, 2014, another state agency physician, F. Greene, M.D., reported a PRFC coming to the same conclusions as Dr. Wong's report. AR 125–27.

### 13. Vocational Consultants

On May 29, 2014, Scott Simon, M.S., a certified rehabilitation counselor, examined Plaintiff and reviewed her medical record. Ex. 25F. Mr. Simon concluded that Plaintiff had lost 100% of her future earning capacity due to her May 2, 2011 injury. *Id.* at 1089. On September 22, 2014, a vocational consultant, Tom Linvill, M.A., C.R.C., also concluded that Plaintiff had lost 100% of her future earning capacity due to her May 2, 2011 injury. *Id.* at 1126.

### B. Non-Medical Evidence

### 1. Records Regarding Driving Abilities

In June 2012, Plaintiff attended a two-part comprehensive driver evaluation. Plainitff demonstrated basic physical abilities to drive independently at slow speeds. Ex. 8F. However, the rehabilitative driver consultant recommended that Plaintiff not drive by herself because of her fears, physical discomfort, and reduced cognitive and visual abilities. *Id.* at 731. The consultant recommended that Plaintiff take 20 hours of driver training lessons to increase her endurance and confidence while driving. *Id.*

### 2. Third Party Statements

The record reviewed by the ALJ contained statements from third parties who did not testify at the hearing. These statements are from Yolanda Ayala, Plaintiff's mother; Jean Green,

Case No. 16-CV-04838-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's friend; and Raul Ayala, Plaintiff's brother. Each of these three statements largely repeated Plaintiff's self-reported symptoms. Exs. 9E, 20E, 21E. Green and Raul Ayala also stated that Plaintiff had been independent before her May 2, 2011 injury.

**C. The ALJ's finding**

The ALJ applied the five-step evaluation process for determining disability described in 20 C.F.R. § 404.1520(a). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 2, 2011, the alleged disability onset date. AR 21. At step two, the ALJ concluded that Plaintiff suffers from the following severe impairments: post-concussive syndrome, cognitive issues, pain disorder/cervical disc displacement, adjustment disorder, and obesity. *Id*. At step three, the ALJ found that Plaintiff's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 22–23.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform less than the full range of light work as defined by 20 CFR 404.1567(b) with some limitations. AR 24. In coming to this conclusion, the ALJ emphasized that except for MRI findings showing "relatively minor abnormalities" and an EMG study that "was consistent with some cervical radiculitis," the objective medical evidence regarding Plaintiff was "largely unremarkable." AR 29. The ALJ also found that some of Plaintiff's self-reported limitations, including limitations in social functioning, "are not entirely credible." AR 23. The ALJ also noted that Plaintiff was able to manage her own funds, that Plaintiff was mostly independent in daily living activities, and that Plaintiff frequently traveled outside the home and had even traveled out of state for a wedding. AR 22–23. The ALJ gave little weight to medical opinions concluding that Plaintiff needed a slower-paced environment. *See, e.g.*, AR 32. The ALJ also gave little weight to medical opinions concluding that Plaintiff suffered from serious cognitive impairments to the extent that those opinions were based on Plaintiff's self-reported symptoms rather than on objective medical evidence. *See, e.g.*, AR 33. The ALJ also made other findings regarding the reliability of different medical opinions, which are discussed below.

Case No. 16-CV-04838-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Based on the evidence and the ALJ's credibility determinations, the ALJ defined Plaintiff's RFC as follows:

> [T]he claimant can lift 20 pounds occasionally and 10 pounds frequently. She can stand and walk for 6 hours in an 8-hour workday and sit for 6 hours in an 8-hour workday. Pushing and pulling should be limited to the weight limits given above. The claimant can only occasionally stoop, crouch, kneel, and balance. Furthermore, the claimant can understand and remember work locations and procedures of a simple, routine nature involving 1- to 2- step job tasks and instructions.

AR 24. Accordingly, at step four, the ALJ found that Plaintiff's RFC did not allow her to perform her past relevant work. AR 40. At step five, however, the ALJ found that Plaintiff was not disabled. AR 40–41. Although a vocational expert testified at the hearing, in the written order the ALJ relied on the medical-vocational guideline ("grids") in conducting the step five inquiry. *Id.* Specifically, the ALJ found that Plaintiff could perform substantially all of the demands of unskilled light work and that Plaintiff's nonexertional limitations "have little or no effect on the occupational base of unskilled light work." AR 41. Therefore, a finding of not disabled was directed by Medical-Vocational Rule 202.21 and Rule 202.14. *Id.* The ALJ found that Plaintiff was not disabled and denied disability benefits. *Id.*

### D. Analysis

In Plaintiff's motion for summary judgment, Plaintiff does not contest the ALJ's decision in steps one, two, and three. At step four, Plaintiff claims that the ALJ gave inadequate reasons for discounting the opinions of Dr. Larsen, Dr. Diebel, Dr. Lynn, Dr. Munday, and Dr. Marinos; that the ALJ ignored the opinion of Dr. Perez; that the ALJ failed to consider the opinions of the state agency psychologists and physicians; and that the ALJ improperly rejected the opinions of vocational consultants. At step five, Plaintiff claims that the ALJ improperly relied solely on the grids in determining that jobs existed in sufficient numbers in the national economy that Plaintiff could perform. The Court considers these arguments in turn.

#### 1. Dr. Larsen, Dr. Diebel, Dr. Lynn, Dr. Munday, and Dr. Marinos

First, Plaintiff claims that the ALJ improperly discounted the opinions of Dr. Larsen, Dr.

Diebel, Dr. Lynn, Dr. Munday, and Dr. Marinos, each of whom opined that Plaintiff had greater limitations than the limitations that the ALJ ultimately adopted in Plaintiff's RFC. As discussed above, the Ninth Circuit has held that an ALJ may discount the opinions of treating and examining physicians if the ALJ offers "specific and legitimate reasons" for doing so that are supported by substantial evidence. *Cain v. Barnhart*, 74 F. App'x 755, 758 (9th Cir. 2003) (unpublished); *see also Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), *as amended* (Apr. 9, 1996) (describing the standards for evaluating treating, examining, and non-examining physicians). The Court first describes the opinions at issue and how the ALJ addressed these opinions. The Court then evaluates whether the ALJ provided "specific and legitimate" reasons supported by substantial evidence for discounting or partially discounting these opinions. *Id.* In doing so, the Court's role is not to make a *de novo* determination whether Plaintiff is entitled to benefits. Instead, "if evidence exists to support more than one rational interpretation, [the Court] must defer to the Commissioner's decision." *See Rollins v. Massanari*, 261 F.3d 853, 957 (9th Cir. 2001); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).

Dr. Larsen was a treating physician. As discussed above, on one occasion Dr. Larsen assigned Plaintiff a GAF score of 50, and on another occasion Dr. Larsen assigned Plaintiff a GAF score of 40. In assigning a GAF score of 40, Dr. Larsen also opined that Plaintiff was "incapable of the most basic full-time entry-level position" and that Plaintiff was "permanently and totally disabled." AR 33. Similarly, as discussed above, Dr. Diebel found that Plaintiff had significant limitations and could not meet competitive standards in several areas.

The ALJ gave Dr. Larsen's GAF scores, along with all GAF scores of 50 or below, little weight because these GAF scores "suggest[ed] greater functional limitations than supported by the record, including the objective medical evidence discussed above, the [Plaintiff's] longitudinal treatment history, and her activities of daily living." AR 32. The ALJ also noted that "GAF scores in general do not address an individual's abilities on a function-by-function basis . . . ." *Id.*

In total, the record shows that three medical professionals offered GAF scores. Dr.

20

Marinos assigned a GAF score of 51–60, Dr. Perez assigned a GAF score of 50, and Dr. Larsen assigned a GAF score of 50, which Dr. Larsen later revised to 40. As discussed above, a GAF score of 51–60 reflects "moderate difficulty," a score of 41–50 reflects "serious impairment in social, occupational, or school functioning," and a score of 31–40 reflects "major impairment in several areas." Thus, the ALJ was faced with conflicting GAF scores, which indicated anywhere from moderate difficulty to major impairment. In giving little weight to GAF scores of 50 and below, the ALJ resolved a conflict in the medical evidence and, as discussed below, substantial evidence in the record adequately supported this conclusion. Although other evidence in the record might justify a different determination than the one the ALJ made, the ALJ's determination satisfies the applicable legal standards. *See Rollins*, 261 F.3d at 957; *Batson*, 359 F.3d at 1193 ("[I]f evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision.").[1]

Similarly, the ALJ rejected Dr. Larsen's conclusions of permanent and total disability on the grounds that Dr. Larsen's opinion on this issue was inconsistent with the record evidence and that Dr. Larsen's opinion was based primarily on Plaintiff's own alleged symptoms rather than on objective medical evidence. AR 33. Dr. Larsen also noted that testing indicated some symptom exaggeration. Ex. 19F at 1007.

As to Dr. Diebel, who completed a check-box form finding that Plaintiff could not meet competitive standards in most areas, the ALJ stated that "[a]lthough Dr. Diebel had a treatment relationship with [Plaintiff], his opinion is inconsistent with the evidence of record, including objective medical findings, [Plaintiff's] longitudinal treatment history, and her activities of daily

---

[1] Similarly, the record contains three IQ evaluations, one of which indicated an IQ of 79, one of which indicated an IQ of 78, and one of which indicated an IQ of 66. Ex. 22F at 1074; Ex. 19F at 1025; Ex. 20F at 1038–39. However, the doctor who administered the test indicating an IQ of 66 specifically stated that this test likely underestimated Plaintiff's intelligence. Ex. 19F at 1025. Moreover, another test indicated symptom exaggeration. *Id.* This doctor also described Plaintiff as "an individual who may be exaggerating the extent of her difficulties." *Id.* at 1026. Here again, the evidence regarding Plaintiff's cognitive abilities was somewhat conflicted, and the ALJ's resolution of the conflict was reasonable.

Case No. 16-CV-04838-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

living. For example, there is no objective evidence that claimant would not even be able to meet competitive standards of asking simple questions or request[ing] assistance." AR 38. The ALJ also found that Dr. Diebel's opinion was internally inconsistent, because "[d]espite finding so many significant limitations – even with respect to the most basic tasks – Dr. Diebel concluded that the claimant can manage her own funds (which must invariably require significant abilities in concentration, persistence or pace)." *Id.*

Dr. Lynn was a treating neurologist. In one-page Work Status Reports for Plaintiff's Worker's Compensation case, Dr. Lynn opined that Plaintiff could perform only four hours of sedentary work per day with no driving. Exs. 16F, at 936, 29F at 1164. The ALJ discounted Dr. Lynn's opinion on this issue and found as follows:

> These restrictions, especially limiting [Plaintiff] to less than an 8-hour workday, are inconsistent with the evidence discussed above, including objective medical findings, [Plaintiff's] longitudinal treatment history, and her activities of daily living. For example, as discussed above, [Plaintiff] admitted to being independent in activities of daily living; she can use public transportation; she exhibited a normal gait on numerous occasions and does not consistently use an assistive device; and she can manage her own funds. This evidence points to more significant functional abilities than alleged by [Plaintiff] and suggested by the above opinions.

AR. 39. The ALJ also noted that a rehabilitative driver consultant had recommended 20 hours of driver training lessons and that "neither the State agency psychological consultants, nor the medical expert who testified at the hearing, found any limitations with respect to [Plaintiff's] driving." *Id.*

The ALJ accepted most of the conclusions of examining psychologists Dr. Munday and Dr. Marinos, which are discussed above. Specifically, the ALJ agreed that Plaintiff has some limitations and cannot return to her past work. AR 32, 34. However, the ALJ disagreed with Dr. Munday's and Dr. Marinos's conclusions that Plaintiff "may need to work in a slower-paced environment." Def. MSJ at 19. With respect to Dr. Marinos's opinion on this issue, the ALJ stated the following: "Dr. Marinos' opinion about [Plaintiff's] ability to maintain employment in a fast-paced environment is not entirely consistent with [the] record. Instead, the undersigned finds that

22

by limiting [Plaintiff] to essentially very simple and routine work, [Plaintiff] would be able to learn her job and perform it on a sustained basis. As such, the undersigned gives partial weight to Dr. Marinos' opinion." AR 34.

Similarly, with regard to Dr. Munday's opinion on this issue, the ALJ stated the following: "Insofar as Dr. Munday suggests that the claimant would need to work in a slow-paced environment in addition to the limitation to simple, routine, 1- to 2-step job tasks, his opinion is not consistent with the record. As such, the undersigned gives his opinion partial weight." AR 32; *see Schuff v. Astrue*, 327 F. App'x 756, 758 (9th Cir. 2009) ("The ALJ gave specific and legitimate reasons supported by substantial evidence for rejecting the opinions of treating physicians . . . because their records did not support their opinions and were inconsistent with substantial evidence in the record.").

The Court next considers whether the ALJ's reasons for discounting or partially discounting these opinions were specific and legitimate and supported by substantial evidence in the record. At the outset, the Court notes that many of the opinions to which Plaintiff refers are opinions on the ultimate issue of whether Plaintiff was disabled or was capable of working. To the extent that Dr. Diebel, Dr. Lynn, Dr. Munday, and Dr. Marinos gave opinions about the ultimate issue of Plaintiff's ability to work and the "nature and severity of [Plaintiff's] impairments," these opinions "[we]re not medical opinions, . . . but [we]re, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d); *see also Sager v. Colvin*, 622 F. App'x 629 (9th Cir. 2015) (unpublished) (holding that whether a claimant is "unable to work" is not a matter of medical opinion but "rather a question reserved to the ALJ").

For the reasons discussed below, the Court finds that ALJ did not err in discounting or partly discounting Dr. Larsen's and Dr. Diebel's opinion that Plaintiff was totally disabled, Dr. Lynn's opinion that Plaintiff should be limited to 4 hours of sedentary work per day, and Dr. Munday's and Dr. Marinos's opinions that Plaintiff should be limited to a slow-paced

United States District Court
Northern District of California

environment. To the contrary, there was substantial evidence in the record supporting the ALJ's finding of a less limited RFC. Particularly, the ALJ pointed to Plaintiff's activities of daily living, the objective medical evidence, Plaintiff's conservative treatment history, and the opinions of other medical sources.

### a. Activities of Daily Living

Perhaps the most important evidence contradicting opinions of a more limited RFC is evidence regarding Plaintiff's activities of daily living. *Cf. Molina v. Astrue*, 674 F.3d 1104, 1112–13 (9th Cir. 2012) (holding that an ALJ may consider whether the Plaintiff "reports participation in everyday activities indicating capacities that are transferable to a work setting."); *Schuff*, 327 F. App'x at 758 ("The ALJ also gave specific, clear, and convincing reasons supported by substantial evidence for finding Schuff was not entirely reliable because her statements were inconsistent with other evidence in the record and her daily activities.").

The ALJ found that Plaintiff was mostly independent in her daily living. For example, Plaintiff used public transportation often, was never prescribed an assistive device, did not consistently use an assistive device, and had recently traveled out of state for a wedding. AR 39. Plaintiff also occasionally watered the lawn, did laundry, performed light household chores, took out the garbage, walked to and from a neighborhood store, took a trip out of state, went to church, occasionally went out for dinner, communicated regularly with family and others, and used a computer for email and Facebook. Exs. 10E, 11F. Additionally, Plaintiff was able to manage her own funds, which required some degree of concentration and mental acuity. Furthermore, December 2011 handwritten treatment notes indicate that Plaintiff entertained 13 people at her home for Christmas, which undermines the finding that Plaintiff lacks the social skills necessary to function in a work environment. Ex. 5F. Plaintiff also has the physical ability to drive, although an evaluator recommended that Plaintiff not drive alone and that Plaintiff take 20 hours of driving lessons to improve her endurance and confidence in driving. *Id.*; *see Molina*, 674 F.3d at 1113 ("[T]he ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting.").

Plaintiff has also demonstrated an ability to concentrate and focus. For example, during the evaluation with Dr. Perez, Plaintiff worked on psychometric questionnaires for two hours without a break, then after a break, Plaintiff continued to work for another two hours. Ex. 11F. Additionally, Dr. Diebel found that Plaintiff could handle her own finances independently. AR 68–69. As the ALJ stated, handling finances "must invariably require significant abilities in concentration, persistence or pace." AR 38.

### b. Objective Medical Evidence

The objective medical evidence also supports the ALJ's conclusion. For example, the most comprehensive evaluation of Plaintiff's visual ability demonstrated that although Plaintiff had diminished visual acuity without corrective lenses, Plaintiff had full visual fields in both eyes and that there was no reason to believe that Plaintiff had developed any kind of visual defect. Exs. 16F, 13F. Plaintiff also consistently demonstrated a normal gait between 2011 and 2014, *see* Exs. 4F, 5F, 6F, 16F, 29F. Additionally, Plaintiff exhibited mostly normal or "mildly weak" strength in her extremities in September 2013 and September 2014. Exs. 27F, 29F. Thus, the objective medical evidence did not support a finding that Plaintiff had serious physical limitations.

There was also little objective evidence of serious cognitive impairment. Two MRIs on May 19, 2011; an EMG study from December 19, 2011; and an EEG study from May 29, 2013 demonstrated only minor abnormalities. Exs. 7F, 5F, 16F, 15F. Plaintiff often exhibited a normal mood, Exs. 5F at 52; 6F at 30, 46, 76; 7F at 19, 37, 56; a pleasant and cooperative demeanor, Exs. 5F at 52; 6F at 46, 76; 16F at 50; clear speech, Exs. 16F at 3; 29F at 3, 10; an intact memory, Ex. 7F at 19, 37, 56, 72; normal attention span and concentration, Exs. 16F at 5, 14, 19; Ex. 29F at 3; and consistent alertness and orientation, Exs. 16F at 5, 14, 19; 29F at 3.

Instead, as the ALJ pointed out, the diagnoses of cognitive impairment were based largely on Plaintiff's own reported symptoms. As Dr. Larsen and others pointed out, and as the ALJ found, these self-reported symptoms indicated exaggeration. *See, e.g.*, Ex. 19F at 1026 (statement of Dr. Morgenthaler that Plaintiff's "differential diagnosis should include somatoform, depressive and anxiety disorders in an individual who may be exaggerating the extent of her difficulties.").

Dr. Larsen concluded that Plaintiff's symptom exaggeration "is probably the result of [Plaintiff] reporting how bleak she feels about her existence and prospects for the future." *Id.* at 1007. However, whatever Plaintiff's motivations were in exaggerating her symptoms, that exaggeration nevertheless casts doubt on opinions relying on these reported symptoms to find substantial cognitive impairment. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) ("An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible.").

### c. Conservative Treatment History

Plaintiff's longitudinal treatment history also supports the ALJ's decision to give less weight to the opinions of Dr. Larsen, Dr. Diebel, Dr. Lynn, Dr. Munday, and Dr. Marinos. As the ALJ stated, "[w]hile the . . . longitudinal treatment history shows ongoing and fairly consistent treatment for numerous symptoms, this treatment has generally been conservative." AR 28. Plaintiff was never hospitalized for her mental problems, but instead medical providers prescribed and recommended medication, therapy, home exercises, and the use of computer brain training games such as Lumosity. Ex. 29F. Despite complaining of falls and dizziness, Plaintiff has never been prescribed the use of an assistive device and has not consistently used an assistive device. Plaintiff has also undergone some vestibular therapy to protect against falls, but there is no evidence that Plaintiff has undergone such therapy after 2012. Exs. 27F p.12, 10F. Plaintiff has also been treated with occipital nerve block and trigger point injections, which are minimally invasive procedures to treat pain. Additionally, Plaintiff has undergone physical therapy, speech and cognitive therapy, and other forms of therapy such as acupuncture. This longitudinal treatment history is relatively conservative and supports the ALJ's conclusion that although Plaintiff has some limitations, Plaintiff's RFC is not as limited as Dr. Larsen, Dr. Diebel, Dr. Lynn, Dr. Munday, and Dr. Marinos opined.

### d. Opinions of Other Medical Sources

The opinions of Dr. Larsen, Dr. Diebel, Dr. Lynn, Dr. Munday, and Dr. Marinos on the

issue of Plaintiff's limitations are also inconsistent with the opinions of other medical sources in the record. For example, Dr. Wang, Plaintiff's treating physician, frequently noted that "[t]here is no impairment of insight or judgment." Ex. 7F at 689, 705, 709, 712. Dr. Aquino-Caro and Dr. Brill, the state agency physicians who conducted mental assessments, also found that Plaintiff had only mild or moderate limitations. *See Jacobs v. Colvin*, 2013 WL 4054454, at *4 (W.D. Wash. Aug. 12, 2013) ("The Ninth Circuit and two sister circuits have held that an RFC restriction to simple tasks is not inconsistent with medical recommendations to have moderate limitations in concentration, persistence, and pace.") (citing *Stubbs–Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir.2008)). Dr. Aquino-Caro and Dr. Brill concluded that Plaintiff could understand 1-2 step job tasks, avoid workplace hazards, and respond appropriately to social interaction and workplace supervision. AR. 107–09, 128–29. Dr. Wong and Dr. Greene, the state agency physicians who conducted physical assessments, concluded that Plaintiff could lift moderate weights and could sit, stand, or walk for 6 hours in an 8-hour workday. AR. 125–27.

Furthermore, Dr. Lynn's opinion regarding Plaintiff's driving ability is contradicted by the opinion of the rehabilitative driver consultant, who drove with Plaintiff for an hour and who has more expertise in the area of driving than Dr. Lynn. Ex. 8F. After driving with Plaintiff, the rehabilitative driver consultant concluded that Plaintiff had "the beginning skills to drive" and recommended 20 hours of driver training lessons to "help [Plaintiff] overcome her safety concerns, increase her driving endurance and instill feelings of wellness and confidence while driving." Ex. 8F at 731.

Finally, after evaluating the record evidence, the medical expert Dr. Jonas testified at the December 17, 2014 hearing that "there are no objective findings really at all" justifying Plaintiff's claimed limitations in the record, and that from the record evidence, it appeared that Plaintiff "has no restrictions at all." AR 59, 63. Plaintiff objects to the use of Dr. Jonas's testimony. Specifically, Plaintiff claims that "other courts have found it improper for the ALJ to give [Dr. Jonas's] opinion great weight while rejecting the opinions of treating medical sources." ECF No. 18, at 15. Plaintiff also claims that Dr. Jonas's assertion that there were "no objective findings" to support a finding

of disability is, "[i]n light of the numerous findings reported even by the ALJ herself, . . . simply incomprehensible." *Id.* However, as even Plaintiff appears to acknowledge, the ALJ did not "give great weight" to Dr. Jonas's opinion or accept Dr. Jonas's opinion in full. To the contrary, the ALJ stated that "to the extent Dr. Jonas found that [Plaintiff] does not have significant limitations, his opinion is inconsistent with [the] record. As such, the undersigned gives his opinion partial weight." AR 37–38. Thus, even if Plaintiff is correct that Dr. Jonas's opinion is not entitled to great weight, this does not undermine the ALJ's decision, which gave Dr. Jonas's opinion only partial weight and specifically discredited Dr. Jonas's opinion that Plaintiff had no significant limitations.

### e. Summary

In short, the ALJ was faced with conflicting evidence regarding Plaintiff's physical and cognitive limitations. The ALJ carefully weighed this evidence and offered specific and legitimate reasons for her conclusions. The ALJ did not simply entirely discount the opinions of Dr. Larsen, Dr. Diebel, Dr. Lynn, Dr. Munday, and Dr. Marinos. For example, the ALJ stated that Dr. Munday's opinion was "generally consistent with the evidence of record." AR 32. The ALJ also stated that many of Dr. Marinos's conclusions, including a GAF score of 51–60, were "generally consistent with th[e] evidence." AR 32. However, after comprehensively considering the evidence discussed above, including Plaintiff's daily activities, the lack of objective medical evidence, Plaintiff's exaggeration of her symptoms, and Plaintiff's treatment history, the ALJ found that some limitations in these medical opinions were not justified.

The reasons discussed above that the ALJ gave for discounting or partially discounting the opinions of Dr. Larsen, Dr. Diebel, Dr. Lynn, Dr. Munday, and Dr. Marinos constitute specific and legitimate reasons supported by substantial evidence. The Ninth Circuit has held that the ALJ may discredit physicians' opinions that are "conclusory, brief, and unsupported by the record as a whole, or by objective medical findings." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). The

United States District Court
Northern District of California

Ninth Circuit has also held that "[a]n ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti*, 533 F.3d at1041. The reports of several medical sources, including Dr. Larsen, were based primarily on Plaintiff's self-reported symptoms, which the ALJ found not entirely credible because they were inconsistent with Plaintiff's daily activities and other evidence in the record. *See Higgins v. Berryhill*, 2017 WL 2875373, at *1 (9th Cir. July 6, 2017) (holding that evidence regarding symptom exaggeration, conservative treatment, inconsistency with objective medical evidence, and daily activities was sufficient to justify giving less weight to testimony describing debilitating symptoms).

Additionally, the Ninth Circuit has held that an ALJ may properly "afford lesser weight" to a medical opinion if that opinion is "internally inconsistent," as with Dr. Diebel. *Burdon v. Colvin*, 650 F. App'x 535, 537 (9th Cir. 2016); *see also Richardson v. Comm'r of Soc. Sec.*, 588 F. App'x 531, 533 (9th Cir. 2014) ("[T]he ALJ properly found that Dr. Hawkins's report was internally inconsistent and that his conclusions regarding Richardson's mental functioning were not compatible with Richardson's ability to hold a paying job for a number of years."). Additionally, the Ninth Circuit has held that an ALJ need not give significant weight to check-box forms, such as Dr. Diebel's report, that offer little explanation for their conclusions. *See Molina*, 674 F.3d at 1111 (holding that ALJs are permitted to reject "check-off reports that [do] not contain any explanation of the bases of their conclusions."); *see also Batson*, 359 F.3d at 1195 (finding that ALJ properly disregarded conclusory evidence in the form of a checklist that lacked supportive objective evidence and was contradicted in other parts of the record).

In light of the evidence in the record, the ALJ's conclusions that parts of the opinions of Dr. Larsen, Dr. Diebel, Dr. Lynn, Dr. Munday, and Dr. Marinos were inconsistent with the record as a whole are specific and legitimate reasons supported by substantial evidence. *Combs v. Astrue*, 387 F. App'x 706, 708 (9th Cir. 2010) (unpublished) (holding that the ALJ permissibly rejected the medical opinion of a treating physician which was unsupported by the record as a whole).

"Substantial evidence must be more than a scintilla, but it need not amount to a preponderance." *Rollins*, 261 F.3d at 957. In the instant case, the ALJ relied on much more than "scintilla" of evidence. Although Plaintiff reported serious cognitive limitations and these medical providers endorsed many of those limitations in their opinions, these opinions are contradicted by Plaintiff's daily activities, the lack of objective medical findings, Plaintiff's exaggeration of symptoms, and Plaintiff's conservative treatment history. While other evidence in the record might justify a different determination than the one the ALJ made, the ALJ's determination satisfies the applicable legal standards. Thus, it is not the role of the Court to second-guess it. *See Rollins*, 261 F.3d at 957; *Batson*, 359 F.3d at 1193 ("[I]f evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision.").

### 2. Dr. Perez

Plaintiff also argues that the ALJ "fail[ed] to address and evaluate the functional limitations described by Dr. Perez," an examining psychologist, and that this failure alone "requires remand for further evaluation." Def. MSJ at 20. The ALJ discussed Dr. Perez's evaluation of Plaintiff and noted that during the evaluation, Plaintiff continued to complain of headaches, neck and shoulder pain, vestibular difficulties, cognitive impairment, and depression and anxiety. AR 32. During the evaluation, Plaintiff walked with a normal gait, exhibited no pain behavior, and sat comfortably through a long interview. The ALJ stated that "[t]his demonstrates, amongst other things, that [Plaintiff's] pain and fatigue, are not as severe as she has alleged." AR 33. The ALJ also noted Dr. Perez's diagnosis and that Dr. Perez assigned Plaintiff a GAF score of 50 based on his evaluation.

Plaintiff is incorrect in stating that the ALJ ignored Dr. Perez's evaluation and opinion. As discussed above, the ALJ considered Plaintiff's behavior during Dr. Perez's evaluation and found that this behavior indicated that Plaintiff's pain and fatigue were not as severe as alleged. Additionally, as to Dr. Perez's assignment of a GAF score of 50, the ALJ stated that "the undersigned gives . . . GAF scores in the record of 50 and below, little weight." AR 32. The ALJ

United States District Court
Northern District of California

gave such GAF scores little weight because a GAF score of 50 or below "suggests greater functional limitations than supported by the record, including the objective medical evidence . . . , [Plaintiff's] longitudinal treatment history, and her activities of daily living. Moreover, GAF scores in general do not address an individual's abilities on a function-by-function basis . . . ." AR 32.

These constitute "specific and legitimate reasons" for discounting Dr. Perez's opinion that Plaintiff's limitations were serious enough to justify a GAF score of 50. *Bray*, 554 F.3d at 1228. As discussed above, the Ninth Circuit has held that an ALJ may discredit a treating physician's opinion if it is "unsupported by the record as a whole, or by objective medical findings." *Batson*, 359 F.3d at 1195. Additionally, as discussed above, there was substantial evidence in the record that Plaintiff's limitations were not extensive enough to justify a GAF score of 50. For example, Plaintiff's activities of daily living suggested that Plaintiff was able to move, concentrate, and function independently. The fact that Plaintiff's medical treatment was relatively conservative also supported the conclusion that Plaintiff's limitations were not as extensive as Plaintiff claimed. Additionally, as the ALJ noted, Plaintiff's behavior at Dr. Perez's evaluation also indicated that Plaintiff's "pain and fatigue, are not as severe as she has alleged." AR 33.

Plaintiff specifically objects that the ALJ failed to address the fact that Dr. Perez's notes mentioned that Plaintiff had moderately severe vestibular difficulties that "independently cause significant functional limitations," "significant cognitive impairment," "significant limitation in her ability to carry out financial activity, and difficulty in crowds and social situations." Def. MSJ at 19, AR 859. However, as Defendant points out, these portions of Dr. Perez's notes mostly summarized treatments that Plaintiff previously received, and Dr. Perez recorded Plaintiff's reported symptoms. *See* AR 852 ("The patient describes the ongoing presence of cognitive impairment and indicates that this is a matter of significant concern."). For example, Dr. Perez noted that "[v]estibular difficulties . . . have been present since [Plaintiff's] industrial accident. . . . As of this date, the patient continues to report about 30 seconds of subjective dizziness upon

31

postural alteration." AR 859. Additionally, Dr. Perez's description of Plaintiff's ability to carry out financial activity and social difficulties fall under the heading "Current Complaints" and are part of Plaintiff's description of her symptoms. AR 851–52. With regard to cognitive impairment, Dr. Perez specifically stated, "I did not perform formal neurocognitive testing. Discussion of cognitive status is deferred to Dr. Claude Munday." AR 857.

In short, with respect to these issues, Dr. Perez's report only repeated symptoms and limitations described by other medical professionals and Plaintiff herself rather than reflecting Dr. Perez's own objective findings. Therefore, it is sufficient that the ALJ addressed these alleged limitations when discussing other medical opinions and Plaintiff's own allegations. The ALJ was not required to specifically address these limitations again in discussing Dr. Perez's report. *See Sager v. Colvin*, 622 F. App'x 629, 629 (9th Cir. 2015) (unpublished) ("The ALJ was not required to discuss every medical finding in the records of [two doctors]. Nor was the ALJ required to credit [the plaintiff's] subjective complaints merely because they were recorded in his physicians' records.") (internal citations omitted). As discussed above, the ALJ adequately addressed Dr. Munday's opinion and other opinions noting limitations similar to those recorded by Dr. Perez. Thus, the ALJ was not required to address these same limitations again simply because they were recorded again by Dr. Perez.

Furthermore, even if the ALJ erred by failing to specifically address the limitations recorded in Dr. Perez's report, this error would be harmless. The Ninth Circuit has held that errors in Social Security adjudications are harmless "where it is clear they did not alter the ALJ's decision" or where "there remains substantial evidence supporting the ALJ's decision and the error 'does not negate the validity of the ALJ's ultimate conclusion.'" *Molina*, 674 F.3d at 1115 (quoting *Batson*, 359 F.3d at 1197); *see also* 28 U.S.C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."). Because the ALJ discussed Dr. Perez's opinion in some detail and because the ALJ discussed the

specific limitations noted by Dr. Perez elsewhere in the written decision, any error in not discussing these limitations specifically with respect to Dr. Perez did not "alter the ALJ's decision" and does not "negate the validity of the ALJ's ultimate conclusion." *Molina*, 674 F.3d at 1115.

In short, the ALJ offered specific and legitimate reasons for discounting Dr. Perez's overall conclusion that Plaintiff had a GAF score of 50, indicating "serious symptoms." AR 859. The ALJ also was not required to specifically address Dr. Perez's notation of the limitations reported by other medical providers, such as Dr. Munday, and by Plaintiff. Additionally, even if the ALJ erred by not addressing these specific limitations, any such error was harmless. The Court therefore rejects Plaintiff's argument that the ALJ's treatment of Dr. Perez's opinion requires remand.

### 3. State Agency Psychologists and Physicians

As discussed above, the state agency psychologists, Dr. Aquino-Caro and Dr. Brill, both concluded that Plaintiff had some limitations but that Plaintiff could work an 8-hour work schedule on a sustained basis. Dr. Aquino-Caro and Dr. Brill also both concluded that Plaintiff could respond appropriately to supervision and social interaction in the workplace if social interaction was infrequent and limited to small groups. Dr. Brill also stated that Plaintiff would need a work setting that "does not prioritize rapid task completion." AR 37. The ALJ gave "great weight" to Dr. Aquino-Caro's opinion and "partial weight" to Dr. Brill's opinion. *Id.*

Plaintiff argues that the ALJ improperly "fail[ed] to either explicitly reject (and explain her reasons for rejecting) or to adopt the limitations described by the state agency psychologists . . . ." Def. MSJ at 20. However, this argument is incorrect on its face. The ALJ rejected the social limitations contained in Dr. Aquino-Caro's and Dr. Brill's opinions and adequately explained her reasons for doing so. With respect to Dr. Aquino-Caro, the ALJ stated the following: "[T]he undersigned gives great weight to Dr. Aquino-Caro's opinion. However, the evidence of record, especially [Plaintiff's] activities of daily living, show that she does not have significant limits in social functioning. Therefore, there are no restrictions on function in the residual functioning

United States District Court
Northern District of California

capacity." AR 36. With respect to Dr. Brill, the ALJ stated the following: "Dr. Brill's opinion is generally consistent with the evidence of record. However, as discussed in analyzing Dr. Aquino-Caro's opinion, [Plaintiff] has only mild limitations in social functioning. As discussed in analyzing Dr. Marinos' opinion, the undersigned also finds that the limitations on rapid task completion are unsupported by the record—especially in light of the significant mental restrictions in the residual functional capacity. Therefore, the undersigned gives partial weight to Dr. Brill's opinion." *Id.*

Thus, contrary to Plaintiff's argument, the ALJ did explicitly reject part of Dr. Aquino-Caro's and Dr. Brill's conclusions, and the ALJ offered adequate reasons for these decisions. These reasons provide specific and legitimate grounds for the ALJ to reject limitations on social functioning and slow pace. For the reasons discussed above, there is substantial evidence in the record indicating that Plaintiff suffers from only mild social impairment and can accomplish simple tasks even if the pace is not slow. For example, the evidence indicates that Plaintiff entertained 13 people at her home for Christmas. Ex. 5F. Additionally, Plaintiff was consistently polite and cooperative when meeting with doctors and other evaluating professionals. *See, e.g.*, Exs. 5F at 52; 6F at 46, 76; 16F at 50. Indeed, Dr. Aquino-Caro himself concluded that Plaintiff had only mild limitations in social functioning. AR 36.

Similarly, Plaintiff also objects to the ALJ's failure to adopt or explicitly reject the limitations described by Dr. Wong and Dr. Greene, the state agency physicians. However, the ALJ offered the following reasons for giving partial weight to the opinions of Dr. Wong and Dr. Greene:

> Their opinions in this case are . . . generally consistent with the objective medical evidence, [Plaintiff's] longitudinal treatment history and her activities of daily living. However, to the extent that they impose limitations beyond those in the residual functional capacity above—for example, regarding [Plaintiff's] ability to balance, reach overhead, handle objects, and avoid hazards—they are not consistent with that record. For instance, [Plaintiff] has demonstrated that she does not consistently use a cane and exhibited a steady gait, as well as largely preserved motor strength, on a number of occasions. Therefore, the undersigned gives these opinions partial weight.

34

AR 37. These reasons constitute specific and legitimate reasons for giving partial weight to the opinions of Dr. Wong and Dr. Greene. As discussed above, there is substantial evidence supporting the ALJ's statement that Plaintiff did not consistently use a cane, that Plaintiff exhibited a steady gait, and that Plaintiff had largely preserved motor strength. *See* Exs. 4F, 5F, 6F, 16F, 27F, 29F.

In short, contrary to Plaintiff's argument, the ALJ did not simply ignore the limitations discussed by the state agency psychologists and physicians. Instead, the ALJ considered these limitations and gave specific and legitimate reasons for rejecting these limitations. Such reasons were supported by substantial evidence in the record. While other evidence in the record might justify a different determination than the one the ALJ made, the ALJ's determination satisfies the applicable legal standards. Thus, it is not the role of the Court to second-guess it. *See Batson*, 359 F.3d at 1193 ("[I]f evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision."). Therefore, the Court rejects Plaintiff's argument that the ALJ failed to consider the limitations discussed in the opinions of state agency psychologists and physicians.

### 4. Vocational Opinions in the Record

Plaintiff also briefly argues that the ALJ improperly rejected the opinions of two vocational analysts, Mr. Simon and Mr. Linvill, who found greater work limitations than the ALJ, as well as one pain management specialist, Dr. Miner, who deferred to Mr. Simon's conclusion. Plaintiff claims briefly that "[t]he ALJ's rejection of the combined medical and vocational opinions of record was as conclusory and flawed as her rejection of the many other medical opinions of record." Def. MSJ at 22.

In addressing these opinions, the ALJ noted that these vocational consultants came to conclusions similar to Dr. Larsen's conclusions. Therefore, the ALJ stated that "[f]or the reasons discussed above (for example, in analyzing Dr. Larsen's December 30, 2013 opinion), the undersigned gives little weight to Mr. Simon's and Mr. Linvill's opinions." AR 38. As discussed above, the ALJ gave specific and legitimate reasons for discounting Dr. Larsen's opinion that

Plaintiff was totally disabled, and these reasons were supported by substantial evidence in the record. *See supra* Part III.D.1. In other words, the ALJ's rejection of other challenged medical opinions was proper, and therefore the Court rejects Plaintiff's argument that "[t]he ALJ's rejection of the combined medical and vocational opinions of record was as conclusory and flawed as her rejection of the many other medical opinions of record." Def. MSJ at 22.

Therefore, the Court finds that the ALJ offered specific and legitimate reasons supported by substantial evidence for rejecting the opinions of the vocational consultants.

### 5. Step Five

Finally, Plaintiff argues that the ALJ erred at step five by referring only to the medical-vocational guidelines, also known as the grids, in determining that there were significant numbers of jobs in the national economy that Plaintiff could perform.

At step five, the Commissioner bears the burden "to show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's [RFC], age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir.1999) (quoting 20 C.F.R. § 404.1560(b)(3)). The Commissioner can meet his burden in two ways: "(1) by the testimony of a vocational expert, or (2) by reference to the [grids]." *Id.* at 1099. "[T]he grids are not designed to establish automatically the existence of jobs for persons with both severe exertional and non-exertional impairments." *Lounsburry v. Barnhart*, 468 F.3d 1111, 1115 (9th Cir. 2006).

"Where a claimant suffers only exertional limitations, the ALJ must consult the grids." *Id.* When use of the grids is mandatory, the ALJ may not come to a different finding than that directed by the grids. *Id.* However, if a claimant's limitations are completely non-exertional, the grids are not applicable and the ALJ must rely exclusively on other evidence in determining whether there are jobs in the national economy that the claimant can perform. *Id.* If a claimant suffers from both sufficiently severe exertional and nonexertional limitations, then the ALJ must look at the grids first and rely on other evidence to examine separately the non-exertional limitations if the grids

United States District Court
Northern District of California

would not otherwise classify the claimant as disabled. *Id.* at 1115-16.

Exertional limitations are defined as those that affect a claimant's "ability to meet the strength demands of a job." 20 C.F.R. § 404.1569a. The grids categorize exertional limitations into the categories of "sedentary work," "light work," and "medium work." *Id.* Each of these designations is based on the ability of the claimant to lift and carry items of varying weight and varying frequency throughout the day. *Id.* For example, "sedentary work" involves carrying "no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." *Id.* Non-exertional limitations are those that do not directly affect strength, but instead affect a claimant's ability to meet other demands of a job. *Id.* "Examples of non-exertional limitations are pain, postural limitations, or environmental limitations." *Tackett*, 180 F.3d at 1102.

"The ALJ should first determine if a claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations." *Id.* If the limitations imposed by a claimant's non-exertional limitations do not significantly limit the range of work the claimant can do, the testimony of a vocational expert is not required. *See, e.g., Hoopai v. Astrue*, 499 F.3d 1071, 1076-77 (9th Cir. 2007) (holding ALJ's determination that a claimant's depression was not a sufficiently severe non-exertional limitation to require the testimony of a vocational expert was appropriate because claimant's depression did not significantly limit his abilities beyond his exertional limitations); *Landa v. Astrue*, 283 F. App'x 556, 558 (9th Cir. 2008) (holding ALJ's determination that a claimant's depression was not a sufficiently severe non-exertional limitation to require the testimony of a vocational expert was appropriate because claimant's depression did not result in more than mild or moderate limitation to his ability to work). Thus, "the fact that a nonexertional limitation is alleged does not automatically preclude application of the grids." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573 (9th Cir. 1988).

The non-exertional limitations that the ALJ incorporated into the RFC are as follows: "The claimant can only occasionally stoop, crouch, kneel, and balance. Furthermore, the claimant can

37

understand and remember work locations and procedures of a simple, routine nature involving 1- to 2- step job tasks and instructions." AR 24. Thus, the question at step five was whether these non-exertional limitations were "sufficiently severe" as to preclude use of the grids alone. *Hoopai*, 499 F.3d at 1076.

In the instant case, the ALJ found that Plaintiff's non-exertional limitations did not significantly limit the range of work that Plaintiff can perform. If this finding was appropriate, then the ALJ justifiably relied only on the grids in making the step five determination.

The Court finds that the ALJ adequately explained why each of Plaintiff's non-exertional limitations did not significantly impact Plaintiff's occupational base. First, the ALJ found that Plaintiff could only occasionally stop, crouch, kneel, and balance. The ALJ noted that under Social Security Ruling 85-15, "light work does not require more than occasional stooping and bending and does not require any crouching." AR 41; *see* Social Security Ruling 85-15 ("If a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact. . . . This is also true for crouching . . . ."). Thus, the ALJ concluded that this limitation did not significantly impact Plaintiff's occupational base. As to the limitation that Plaintiff should only occasionally balance, the ALJ noted that under Social Security Ruling 85-15, balancing is "not significant at any exertional level." AR 41. Finally, the ALJ noted that with respect to Plaintiff's mental limitations, the ALJ noted that these limitations do not significantly impact Plaintiff's ability to perform unskilled work, which requires "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. These jobs ordinarily involve dealing primarily with objects, rather than with data or people." *Id.* Thus, the ALJ concluded that Plaintiff's "mental limitations have little or no effect on the occupational base of unskilled light work." *Id.*

Plaintiff claims that the ALJ's decision was improper because it did not address all of Plaintiff's non-exertional limitations "in combination." AR 41. Specifically, Plaintiff claims that

38

the ALJ relied on Social Security Rulings, particularly Social Security Ruling 85-15, that only addressed particular limitations in isolation and did not address Plaintiff's unique combination of limitations. The Court agrees that the ALJ could have been more careful to emphasize that Social Security Ruling 85-15 did not specifically address Plaintiff's particular set of non-exertional limitations. *See* Social Security Ruling 85-15 ("Where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work."). However, in context it is clear that the ALJ considered Plaintiff's non-exertional limitations collectively, and not simply one-by-one. For example, the ALJ specifically stated that "the additional *limitations* have little or no effect on the occupational base of unskilled light work." AR 41 (emphasis added). The ALJ also noted that "the light unskilled job base is only minimally affected by [Plaintiff's] non-exertional *limitations*." *Id.* (emphasis added). Both of these statements indicate that the ALJ considered the collective impact of all of Plaintiff's non-exertional limitations. The fact that the ALJ cited Social Security Ruling 85-15 in discussing particular examples of Plaintiff's specific limitations does not undermine this conclusion.

Thus, the ALJ adequately justified her determination that Plaintiff's non-exertional limitations "have little or no effect on the occupational base of unskilled light work." *Id.* For that reason, the ALJ was not required to consider the findings of a Vocational Expert and was justified in relying on the grids alone.

Nevertheless, even if the ALJ erred in failing to address the findings of the Vocational Expert in her decision, this error was harmless. As discussed above, the Ninth Circuit has held that errors in Social Security adjudications are harmless "where it is clear they did not alter the ALJ's decision" or where "there remains substantial evidence supporting the ALJ's decision and the error 'does not negate the validity of the ALJ's ultimate conclusion.'" *Molina*, 674 F.3d at 1115 (9th Cir. 2012) (quoting *Batson*, 359 F.3d at 1197); *see also* 28 U.S.C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the

United States District Court
Northern District of California

parties.").

At the hearing in the instant case, a Vocational Expert testified in response to hypothetical questions posed by the ALJ. Specifically, the ALJ discussed a hypothetical individual who had essentially the same limitations that the ALJ found could credibly be attributed to Plaintiff. *See* AR 85 (mentioning, among other symptoms, memory problems, dizziness depression, fatigue, speech problems, and balancing problems). The Vocational Expert testified that this hypothetical individual could not perform Plaintiff's past work, but that this hypothetical individual could perform several other fairly common jobs, including counter clerk (22,000 in state of California); retail marker (36,000 in state of California), and stock checker (24,000 in state of California). AR 86.

Although the ALJ did not rely on the Vocational Expert's testimony in the ALJ's written decision, it is clear from the Vocational Expert's testimony that even if the ALJ had done so, the ALJ would have come to the same conclusion. The ALJ incorporated all of Plaintiff's non-exertional limitations in the hypothetical questions the ALJ posed to the Vocational Expert, and the Vocational Expert identified three jobs existing in substantial numbers that such an individual could perform. As discussed above, these jobs included counter clerk, retail marker, and stock checker. Thus, even if Plaintiff is correct that the ALJ should have considered the ALJ's testimony in addition to the grids, "it is clear" that the ALJ's reliance on the grids "did not alter the ALJ's decision" and "there remains substantial evidence supporting the ALJ's decision . . . .'" *Molina*, 674 F.3d at 1115. Thus, any error in this respect was harmless. *See Draper v. Colvin*, 2014 WL 3969917, at *8 (E.D. Cal. Aug. 13, 2014) ("Even if the Court were to find that a restriction to simple, repetitive tasks is not fully consistent with the ability to perform unskilled work, the record still contains substantial evidence that Plaintiff retains the ability to perform work which exists in significant numbers in the national economy.") (internal quotation marks omitted).

## IV. CONCLUSION

In summary, the ALJ's decision that Plaintiff is not disabled under the Social Security Act

40

is supported by substantial evidence in the record. Accordingly, Plaintiff's motion for summary judgment is DENIED, and Defendant's motion for summary judgment is GRANTED. The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: July 12, 2017

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

Case No. 16-CV-04838-LHK
ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT